UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WEBASTO PRODUCTS NORTH AMERICA,

        Plaintiff,                    Civil Action No.
                                                  10-CV-13063
vs.
                                                  HON. MARK A. GOLDSMITH

A.A. MABRU, INC., et al.,

        Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR ALTERNATIVELY, UNDER THE DOCTRINE OF FORUM NON-CONVENIENS**

**I. INTRODUCTION**

This is a breach of contract case. Plaintiff Webasto Products North America, Inc. is a Michigan corporation engaged in the business of manufacturing accessory items, such as generators and air conditioners, for use in the marine industry. Defendant AA Mabru, Inc. (AA Mabru), a Florida corporation owned by Defendant Alain Mabru (Mabru) (collectively, "Defendants"), is in the business of selling and installing marine accessory items.

The Complaint contains five counts:

Count I: Account Stated
Count II: Breach of Guaranty
Count III: Breach of Contract
Count IV: Trade Disparagement/Business Defamation
Count V: Injunctive Relief

Now before the Court is Defendants' motion to dismiss for lack of personal jurisdiction or, alternatively, under the doctrine of forum non-conveniens. Defendants claim that they have insufficient contacts with Michigan and that, accordingly, the exercise of personal jurisdiction

over them would be improper. Alternatively, Defendants argue that the case should be dismissed under the doctrine of forum non-conveniens. By agreement of the parties, this matter will be decided without oral argument. For the reasons that follow, Defendants' motion will be denied.

## II. BACKGROUND

AA Mabru is a Florida corporation with its principal place of business in Florida. Mabru Aff. ¶ 1. AA Mabru is in the business of supplying marine products to pleasure craft owners, performing maintenance and repairs on boats, and selling pre-owned boats primarily to customers in Fort Lauderdale, Florida, and surrounding areas. Id. AA Mabru is owned by Mabru.

Plaintiff is a Michigan corporation with its principal place of business in Michigan. Compl. ¶ 1. Plaintiff is in the business of, among other things, manufacturing and distributing various accessory items for use in the marine industry, including air conditioners. Id. ¶ 2.

In early 2009, David Wollard, an employee of Plaintiff then working out of West Palm Beach, Florida, contacted Mabru at Mabru's Miami, Florida, office regarding an arrangement whereby Plaintiff would sell its air conditioning products to AA Mabru for resale to AA Mabru customers. Mabru Aff. ¶ 13. Discussions between Mabru and Wollard ultimately resulted in a purported written agreement whereby Mabru would serve as a "master dealer" for Plaintiff by purchasing air conditioning units from Plaintiff for resale to AA Mabru customers. Id. ¶ 14; Russel Aff. ¶¶ 4-7.[1] The agreement also granted Defendants a license to utilize Plaintiff's trademarks and trade names. The agreement contains a choice of law provision: "This

---

[1] Jeffrey A. Russel is an officer of Plaintiff. Russel Aff. ¶¶ 1, 3.

Agreement has been made in and shall be construed and interpreted according to the substantive laws of the State of Michigan." Def. Mot. at Ex. D.[2]

In addition, Mabru executed a guaranty agreement whereby he agreed to personally guarantee any indebtedness owing to Plaintiff by AA Mabru. Mabru Aff. ¶ 15; Russel Aff. ¶ 9. The guaranty agreement, which is attached to the Complaint as Exhibit A, was executed by Mabru in Florida. Id. The master dealer agreement and the guaranty agreement together serve as the underlying basis for this breach of contract lawsuit.

According to Mabru, communications regarding the master dealer agreement and the guaranty agreement, both before and after they were executed, took place in Florida exclusively between Mabru and Wollard. Mabru Aff. ¶ 15. However, Russel testified that Mabru executed a credit application, which he forwarded to Plaintiff's main office in Michigan. Russel Aff. ¶¶ 9-10. Mabru admits that Plaintiff's accounting department, which is located in Michigan, contacted him "on perhaps one or two occasions" and that Mabru sent payments to Plaintiff's accounting department located in Michigan. Id. at 15-16; Russel Aff. ¶ 13. In fact, Plaintiff's invoices to Defendants required Defendants to remit payments to a post office box located in Detroit, Michigan. See Pl. Resp. Ex E (invoices).

Russel states that all of the invoices sent to Mabru in connection with products ordered from Plaintiff were prepared in and mailed from Plaintiff's Michigan's office. Russel Aff. ¶ 12.

---

[2] Both parties have submitted a copy of the master dealer agreement; however, both copies appear to be generic form contracts that are unsigned and do not mention Defendants by name. Defendants argue in their reply brief that the agreement should be disregarded for the present purposes because there is no evidence that it was executed. However, Mabru admits in his affidavit that he and Plaintiff "ultimately negotiated an agreement" and that "[t]his agreement is the subject of the present lawsuit." Mabru Aff. ¶ 14. Mabru also states in his affidavit: "All of my communications with [Plaintiff] regarding the agreement, both before and after it was entered into, took place in Florida." Id. ¶ 15 (emphasis added). These statements, made by Mabru under oath, preclude the argument made by Defendants in their reply brief that the Court should not consider the master dealer agreement.

3

Mabru admits that he sent some purchase orders for air conditioning units to Plaintiff in Michigan, while he sent other purchase orders to a Florida-based representative of Plaintiff. Mabru Aff. ¶ 16. This admission is not inconsistent with Russel's testimony that "[AA Mabru] placed the majority of its orders through [Plaintiff's] order desk located in . . . Michigan." Russel Aff. ¶ 11. According to Mabru, the air conditioning units that he purchased from Plaintiff were stored in a warehouse located in Miami, Florida; Mabru picked up the units from this location. Mabru Aff. ¶ 16; Russel Aff. ¶ 15. Russel clarified in his affidavit that the warehouse to which Plaintiff's products were shipped was independently owned and operated; according to Russel, Plaintiff does not own or operate any offices or facilities within Florida. Russel Aff. ¶¶ 15-16. Moreover, according to Russel, when AA Mabru fell behind on its payments to Plaintiff, the arrearages were discussed between Mabru and Plaintiff's Michigan-based credit/finance desk. Id. ¶ 14.

Mabru also states that he traveled to Michigan approximately four or five times between 2004 and 2008 for the purpose of negotiating an unrelated commercial arrangement with Plaintiff. Mabru Aff. ¶ 17. At the time, Mabru was acting on behalf of Coolman, a company with whom Mabru was then involved. Id.

The following additional facts are also reflected in Mabru's affidavit:

(i) AA Mabru does not have a physical office in Michigan. Id. ¶ 4.

(ii) AA Mabru does not have a registered agent in Michigan, and does not conduct business in Michigan. Id.

(iii) AA Mabru does not have any employees, contractors, or agents working on its behalf in Michigan. Id. ¶ 5.

(iv) AA Mabru does not advertise in Michigan. Id. ¶ 6

(v) Neither AA Mabru nor Mabru have physical or personal property in Michigan. Id. ¶¶ 7-8.

(vi) Neither AA Mabru nor Mabru carry on any ongoing business in Michigan.  Id. ¶ 9.

(vii) AA Mabru does not solicit business from Michigan customers and has never sold any products to Michigan customers.  Id. ¶ 10.

(viii) Neither AA Mabru nor Mabru maintain a bank account in Michigan.  Id. ¶ 11.

### III.  LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Federal Rule of Civil Procedure 12(b)(2) authorizes the filing of motions to dismiss for lack of personal jurisdiction.  As stated by the Sixth Circuit, when

> [p]resented with a properly supported 12(b)(2) motion and opposition, the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions.  The court has discretion to select which method it will follow, and will only be reversed for abuse of that discretion.

Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991) (citations omitted).  A court may opt to permit discovery or convene an evidentiary hearing "[i]f the written submissions raise disputed issues of fact or seem to require determinations of credibility."  Serras v. First Tenn. Bank Nat. Ass'n, 875 F.2d 1212, 1214 (6th Cir. 1989).  When the trial court has determined that the motion to dismiss for lack of personal jurisdiction can be decided upon the written submissions, the plaintiff must only make a prima facie showing that personal jurisdiction exists; if this burden is satisfied, the motion to dismiss should be denied notwithstanding any controverting presentation by the moving party.  The trial court must consider the pleadings and affidavits in the light most favorable to the plaintiff.  Id.

In the present case, the Court resolves Defendants' motion to dismiss based on the parties' written submissions alone because the material facts pertinent to the jurisdictional controversy are not in dispute.

5

## IV.  ANALYSIS

In analyzing challenges to personal jurisdiction, courts distinguish between "general" and "specific" jurisdiction.  Third Nat'l Bank in Nashville v. WEDGE Group Inc., 882 F.2d 1087, 1089 (6th Cir. 1989).  General jurisdiction is personal jurisdiction over the defendant to adjudicate claims not necessarily related to the defendant's contacts with the forum state, provided the defendant's contacts with the forum state are of a "continuous and systematic" nature.  On the other hand, "[a]n exercise of specific jurisdiction is proper where the claims in the case arise from or are related to the defendant's contacts with the forum state."  Intera Corp. v. Henderson, 428 F.3d 605, 615 (6th Cir. 2005).  In the present case, Plaintiff does not argue that Defendants' contacts with Michigan are "continuous and systematic" such that general jurisdiction is proper; rather, Plaintiff contends only that the Court should exercise specific jurisdiction over Defendants.

To determine whether personal jurisdiction exists, federal courts apply the law of the forum state, subject to the limits of the Due Process Clause of the Fourteenth Amendment. CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir. 1996).  Thus, the defendant must be amenable to suit under the forum state's long-arm statute and the requirements of due process must be satisfied.  Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1115 (6th Cir. 1994). The Court first addresses whether it may exercise specific jurisdiction over Defendants under Michigan's long-arm statute, and then whether the exercise of personal jurisdiction over Defendants comports with federal due process requirements.

### A.  Michigan's Long-Arm Statute

Under Michigan's long-arm statute, courts may exercise specific jurisdiction over defendants who (i) transact business within the state, (ii) do or cause any act to be done in the

state resulting in an action in tort, (iii) own, use, or possess any real or tangible property within the state, (iv) contract to insure any person, property, or risk located within the state, or (v) enter into a contract for services to be performed or for materials to be furnished in the state by the defendant. Mich. Comp. Laws § 600.715.

Plaintiff argues that jurisdiction over Defendants is proper because Defendants "transact[ed] business within the state." The Michigan Supreme Court has held that this requirement is satisfied by "the slightest" act of doing business in Michigan. Sifers v. Horen, 188 N.W.2d 623, 624 n.2 (Mich. 1971). Here, the undisputed facts reveal that Mabru (i) forwarded a credit application to Plaintiff's main office in Michigan; (ii) accepted accounting invoices from Plaintiff's Michigan-based office; (iii) mailed payments to Plaintiff's Michigan-based office; and (iv) sent at least some purchase orders to Plaintiff's Michigan-based office. The Court finds that these actions satisfy the minimal "slightest act of doing business" test. Michigan's long-arm statute is satisfied for specific personal jurisdiction.

### B. Due Process

The Sixth Circuit has articulated a three-part inquiry to determine whether the exercise of specific jurisdiction over a defendant comports with federal due process requirements:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

S. Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968). The Court addresses each element, in turn.

### 1. Purposeful Availment

To satisfy federal due process requirements, a defendant must purposefully avail itself of the privilege of doing business in the forum state. Purposeful availment, which is the "constitutional touchstone" of personal jurisdiction, is present where the defendant's contacts with the forum state "proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)). Thus, the focus of the inquiry is whether the defendant engaged in "some overt actions connecting the defendant with the forum state." Dean v. Motel 6 Operating L.P., 134 F.3d 1269, 1274 (6th Cir. 1998). A defendant's "random, fortuitous, or attenuated" contacts with the forum are insufficient to support jurisdiction. Burger King, 471 U.S. at 475. Moreover, while merely entering into a contract with a citizen of the forum state is not enough, in itself, to confer personal jurisdiction, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." Id. at 479.

The facts regarding Defendants' contacts with Michigan are not in dispute. The affidavits of Mabru and Russel are not inconsistent; collectively, they reveal that: (i) Plaintiff's agent, Wollard, who was then working in Florida, first initiated contact with Mabru, at his Florida office, regarding the present transaction; (ii) negotiations between Wollard and Mabru took place in Florida, eventually resulting in an ongoing agreement whereby Mabru would sell Plaintiff's products; however, Mabru forwarded a credit application to Plaintiff's Michigan office; (iii) Mabru and Plaintiff's Michigan-based accounting department interacted with one another during the parties' business relationship, the latter sending invoices to the former and the

former mailing payments to the latter; (iv) Mabru sent purchase orders to Plaintiff's office in Michigan; he also sent purchase orders to Plaintiff's representative in Florida; and (v) the air conditioning units ordered by Mabru were stored and picked up in Florida. Other than these contacts, AA Mabru and Mabru have no additional pertinent ties to Michigan.[3]

Plaintiff argues that the present case is analogous to Burger King, a case involving a Michigan citizen, the defendant, who entered into a franchise agreement with Burger King, a Florida corporation, to operate a Burger King restaurant in Michigan. The franchise agreement, which the plaintiff negotiated with both Burger King's district office in Michigan and its headquarters in Florida, required the Michigan-based defendant to pay Burger King an initial fee of $40,000, and to commit to pay monthly royalties, advertising and sales promotion fees, and rent. In exchange, Burger King granted its franchisee the right to use Burger King trademarks, service marks, and standardized restaurant facilities for a twenty-year period; Burger King also provided its franchisee with a variety of information regarding the operation of its restaurant, marketing and advertising assistance, ongoing restaurant management training, and accounting, inventory and cost-control guidance. 471 U.S. at 464-465. The defendant operated the Burger King restaurant in Michigan for a short while, but eventually fell behind on its monthly payments, which were being made directly to Burger King's corporate headquarters in Florida pursuant to the franchise agreement. Burger King terminated the agreement; however, the defendant continued to operate the franchise, prompting Burger King to file a lawsuit in Florida, asserting nonpayment of franchise fees under the parties' franchise agreement and tortious

---

[3] As noted above, Mabru traveled to Michigan four times in the past in connection with a matter unrelated to the present transaction and controversy. Because Plaintiff does not assert that Defendants' contacts with Michigan are "continuous and systematic" such that general jurisdiction over Defendants is proper, Defendants' ties with Michigan that are unrelated to the present claims are irrelevant to the present specific jurisdiction analysis. See Intera Corp. 428 F.3d at 615 ("[a]n exercise of specific jurisdiction is proper where the claims in the case arise from or are related to the defendant's contacts with the forum state").

interference with Burger King trademarks and service marks through the defendant's continued, unauthorized operation of a Burger King restaurant. Id. at 468-469.

The Court determined that the Florida court's jurisdiction over the defendant was proper under the circumstances because, although the existence of a business contract between the parties was alone insufficient to render personal jurisdiction over the defendant in Florida proper, the nature of the contract and the parties' course of dealings established that the defendant had "deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." Id. at 479-480 (quotations marks, citations, and brackets omitted). The Court also noted that the franchise agreement into which the defendant voluntarily entered "envisioned continuing and wide-reaching contacts with Burger King in Florida" and that the defendant's nonpayment of the franchise fee and unauthorized use of Burger King trademarks "caused foreseeable injuries to [Burger King] in Florida." Id. at 480. The mere fact that the defendant did not physically enter the forum state was not deemed problematic. Id. at 476.

The Court agrees with Plaintiff that Burger King controls the present dispute. A review of the parties' master dealer agreement, along with the affidavits of Russel and Mabru, reveal that the Defendants contemplated an ongoing, indefinite business relationship with Plaintiff, a Michigan corporation, whereby Defendants would sell Plaintiff's products to customers in Florida. The mere existence of this contractual relationship, alone, is insufficient under Burger King to establish personal jurisdiction. The Court instead considers, as did the Burger King Court, the nature and quality of the parties' relationship and their course of dealings, as well as any overt actions taken by Defendants connecting them to Michigan.

First, unlike in <u>Burger King</u> where the defendant first initiated contact with Burger King when he applied for a franchise, Mabru was first approached by an employee of Plaintiff who was then working in Florida.  Thus, Mabru did not initially reach out to Michigan with the intention of commencing a relationship with Plaintiff.  This fact weighs against exercising jurisdiction over Defendants.

Second, negotiations relating to the franchise agreement in <u>Burger King</u> took place, in part, between the Michigan-based defendant and Burger King's headquarters in Florida.  The evidence in the present case reveals that the master dealer agreement was negotiated mostly between Mabru and Wollard in Florida, except that Mabru forwarded a credit application to Plaintiff's main office in Michigan.  There is no evidence in this case that Plaintiff's Michigan office was actively involved in the negotiation of the master dealer agreement in the same way as Burger King's Florida headquarters was involved in the negotiation of the franchise agreement at issue in that case.  Nevertheless, Mabru minimally reached out to Michigan in the negotiation stage of this transaction.

After the initiation and negotiation stages of the present transaction, Mabru took several conscious, overt actions directed at Michigan.  First, Mabru mailed payments to Plaintiff's Michigan-based accounting department.  Second, Mabru sent purchase orders to Plaintiff's office in Michigan.  Third, Mabru interacted with Plaintiff's Michigan office to discuss arrearages.  These facts weigh in favor of exercising jurisdiction over Defendants.

Additionally, the Court considers "prior negotiations and contemplated future consequences" in determining whether Defendants purposefully established minimum contacts with Michigan.  In the present case, the parties had a prior business relationship unrelated to the present transaction.  Mabru states in his affidavit that he traveled to Michigan four or five times

to negotiate another commercial arrangement with Plaintiff. Because this connection to Michigan does not relate to the claims asserted in the present case, the Court does not consider it when analyzing the ways in which Defendants reached out to Michigan. However, that Mabru had a prior relationship with Plaintiff, requiring him to travel to Michigan on several occasions, illustrates that he made a conscious decision to transact business with a Michigan-based company at the time the present transaction was initiated and negotiated. This fact weighs in favor of exercising jurisdiction over Defendants.

In addition, the affidavits of Russel and Mabru, along with the master dealer agreement itself, reflect that the parties contemplated a continuing relationship of indefinite duration and not a so-called "one shot deal." For this reason, the three cases on which Defendants rely in support of their position that personal jurisdiction is lacking -- <u>Kerry Steel, Inc. v. Paragon Indus.</u>, 106 F.3d 147 (6th Cir. 1997), <u>LAK, Inc. v. Deer Creek Enters.</u>, 885 F.2d 1293 (6th Cir. 1989), and <u>DTE Energy Tech., Inc. v. Briggs Elec., Inc.</u>, No. 06-12347, 2007 WL 674321 (E.D. Mich. Feb. 28, 2007), all of which involve a single transaction rather than ongoing, continuous business relationships -- are inapposite.

Finally, the Court notes that the master dealer agreement contains a choice of law provision specifying that Michigan law governs the parties' contractual agreement. While the existence of this provision is certainly not dispositive of the matter, it weighs in favor of exercising jurisdiction over Defendants. <u>See</u> <u>Burger King Corp.</u>, 471 U.S. at 482 (holding that choice-of-law provisions are alone insufficient to establish jurisdiction, although they can "reinforce [a] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there").

For the reasons discussed above and taking the evidence in the light most favorable to Plaintiff, the Court finds that Defendants have purposefully availed themselves of the privilege of doing business in Michigan.

### 2. Connection Between Defendants' Activities and the Present Cause of Action

Under the second step of the Mohasco framework, Plaintiff must make a prima facie showing that the cause of action arose from Defendants' activities in Michigan. In Third National Bank in Nashville v. WEDGE Group Inc., 882 F.2d 1087, 1091 (6th Cir. 1989), the Sixth Circuit reiterated "that the 'arising from' requirement is satisfied if the cause of action is 'related to' or 'connected with' the defendant's forum contacts." The undisputed evidence reveals that Plaintiff's Michigan-based accounting department and Defendants interacted with one other regarding payment issues; the former sent invoices to the latter and the latter was required to remit payments to the former. One of the allegations made in the present case is that Defendants failed to pay for the products they ordered from Plaintiff. In other words, Defendants allegedly failed to remit payments to Plaintiff's office in Michigan. In this way, the case relates to and is connected with Defendants' contacts with Plaintiff's accounting department in Michigan. Thus, the second element of the Mohasco framework is satisfied.

### 3. Substantial Connection

Under the final step of the Mohasco framework, the acts of Defendants must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. "An inference arises that the third [Mohasco] factor is satisfied if the first two requirements are met." Bird v. Parsons, 289 F.3d 865, 875 (6th Cir. 2002). Here, taking the facts in the most favorable to Plaintiff, Defendants entered into an ongoing, continuous business relationship with Plaintiff, knowing from past dealings that Plaintiff is a Michigan-based

company; Defendants interacted with Plaintiff's offices in Michigan by sending purchase orders and remitting payments to that location; and Defendants agreed to be bound by Michigan law. Taking the facts in the light most favorable to Plaintiff, Defendants knew it was doing business with a Michigan-based company and should not be surprised that it is now being haled into a Michigan court to litigate claims arising from this transaction. There is nothing unreasonable in subjecting Defendants to jurisdiction in Michigan.

## V. FORUM NON-CONVENIENS

Where there are only two parties to a dispute, as is the case here, "there is good reason why it should be tried in the plaintiff's home forum if that has been his choice." Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947). A court may, in its sound discretion, dismiss a case based on the doctrine of forum non-conveniens when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would "establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience," or when the "chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." Id. An action may be dismissed on the basis of forum non conveniens if the defendant demonstrates that (1) there is a reasonable alternative forum available and (2) the balance of private and public interests favors transfer. Stewart v. Dow Chem. Co., 865 F.2d 103, 106 (6th Cir. 1989). The parties dispute only the second element.

In assessing the private interests, the Court considers the relative ease of access to sources of proof; the availability of compulsory process for attendance of witnesses; the possible need to view the premises; and all other practical problems that make a trial more convenient and less expensive. In assessing the public interests, the Court balances the following factors: any administrative difficulties of courts with clogged dockets; the burden of jury duty on people of a

community having no connection with the litigation; the desirability of holding a trial near those most affected by it; and the appropriateness of holding a trial in a diversity case under a foreign state's law. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-509 (1947).

Defendants argue that it would be far more inconvenient for them to try this case in Michigan than it would be for Plaintiff to try the case in Florida because Plaintiff is a multinational company while Defendants are a "regionally oriented, single location business." Defs. Mot. at 19. However, the size of the parties is not a relevant consideration under the forum non-conveniens framework. Further, Defendants have not even attempted to demonstrate that public and private interests weigh in favor of this matter being litigated in Florida. Accordingly, the Court rejects Defendants' argument based on forum non-conveniens.

## VI. CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for lack of personal jurisdiction or, alternatively, under the doctrine of forum non-conveniens, is denied.

SO ORDERED.

Dated: February 8, 2011                              s/Mark A. Goldsmith
                                                     MARK A. GOLDSMITH
                                                     United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 8, 2011.

                                                     s/Deborah J. Goltz
                                                     DEBORAH J. GOLTZ
                                                     Case Manager